J. D. ALEXANDER *et al.*, Plaintiffs-Appellants, *v.* STANDARD OIL COMPANY *et al.*, Defendants-Appellees.

Fifth District   No. 80-98

Opinion filed July 7, 1981.

Edward L. Welch, of Edwardsville, for appellants.

Martin M. Ruken and Robert J. Rubin, both of Chicago, and James K. Almeter, of Alton (Friedman & Koven and Hoagland, Maucker, Bernard & Almeter, of counsel), for appellees.

Mr. PRESIDING JUSTICE KASSERMAN delivered the opinion of the court:

Plaintiffs appeal from the trial court's order granting defendants' motion for summary judgment. Action was originally brought by 34 plaintiffs on March 1, 1976, alleging that defendants, Standard Oil Company and American Oil Company, had committed a breach of certain employment contracts. Defendants filed a motion to dismiss, alleging that the court lacked subject matter jurisdiction because of pre-emption by the National Labor Relations Act. The motion to dismiss was denied. On appeal, this court affirmed the denial, finding that the trial court did have jurisdiction of the subject matter. *Alexander v. Standard Oil Co.* (1977), 53 Ill. App. 3d 690, 368 N.E.2d 1010.

On August 16, 1978, defendants filed an amended answer, alleging, *inter alia*, that for valuable consideration, 24 of the plaintiffs had signed general releases of all causes of action, claims, and liabilities against the defendant, which releases were executed after the accrual of the cause of action set forth in plaintiffs' complaint. The suits of 10 of the plaintiffs who are alleged to have signed releases have been dismissed, and such plaintiffs are not involved in this appeal. Defendants' motions for summary judgment against the 14 plaintiffs who executed the releases and who remained in the suit were granted by the trial court and such plaintiffs appeal.

Parenthetically, at the outset of the employer-employee relationship created between plaintiffs and defendants, the employer was designated as Standard Oil Company, and the employer in subsequent employment dealings with plaintiffs was specified to be American Oil Company, also

known as Amoco. This change in designation of the employer has not been explained in the current proceedings in this court; however, such change in designation is not material to this appeal. Therefore, we refer to the employer as "defendant" hereafter.

Dispute between the parties arose from a change in employment relationship, apparently undertaken within the petroleum industry as a result of the energy crisis. Prior to the dispute, plaintiffs had been "commission agent" employees of defendant, pursuant to individual contracts of employment. The contracts set forth the terms and conditions of the employment and the payment of commissions. It also provided for termination of the contracts by either party at will by giving 90 days notice.

Each plaintiff was also a member of the Central States Petroleum Union; and the last union contract executed with defendant incorporated the individual employment contracts by reference. The union contract expired on August 31, 1973, and was extended by agreement until August 31, 1974. It provided, *inter alia*, that defendant would pay to each plaintiff a percentage commission based on plaintiff's sales of specified products (known as "regular commissions") and a commission based on a percentage of the gross sale price of defendant's direct sales of other products to plaintiffs' customers in each plaintiff's geographic territory (known as "cross-sell commissions").

Negotiations between the union and defendant failed to result in a new contract, and the union brought charges before the National Labor Relations Board, alleging unfair labor practices under section 8 of the National Labor Relations Act (29 U.S.C. §158). The Board refused to issue a complaint, finding insufficient evidence that defendant failed and refused to bargain in good faith by unilaterally changing terms and conditions of employment and by seeking to implement proposals without bargaining in good faith. The Board noted that the parties had engaged in extensive negotiations for four months, during which time defendant maintained the position that fuel prices of September 1, 1973, as opposed to current market prices, should be employed in computing the distribution commissions of its agents. The Board observed that defendant contended: (1) that the recent extraordinary rise in petroleum prices had resulted in a windfall to its agents through the inflation of commissions based on the prices of the products delivered; and (2) that, as a consequence of such inflation of commissions, undue costs were thereby imposed on the defendant because Federal Energy Office regulations precluded the inclusion of increased distribution commissions in price increases to the customer. Further, the Board noted that the union had presented no alternative to the use of September 1, 1973, fuel prices for the calculation of commissions. Finally, the Board found that since

further negotiations appeared fruitless, there was no basis for the union's contention that the parties had not reached impasse on the issue before defendant implemented its proposal.

In the spring of 1975, contemporaneous with the NLRB's refusal to issue a complaint, defendant initiated a nationwide conversion program whereby commission agent employees, including the plaintiffs, would alter their contractual status with defendant to become independent "jobbers" of defendant's products. Commission agent employment status was to be discontinued entirely under the conversion program. As a result, each commission agent was presented with two alternatives; he could execute a "conversion agreement" and become an independent jobber, or he could execute a "final settlement agreement," ending his relationship with the company.

The conversion program was explained to the commission agent employees in a series of meetings arranged by defendant commencing in 1975. Each employee was given a handbook explaining the conversion alternatives.

While the conversion program was being continued, the plaintiffs filed their complaint in the circuit court on March 1, 1976. The complaint alleged breach of employment contracts based on the union contract and individual employment contracts. Damages were alleged to have been suffered by plaintiffs by reason of nonpayment of the cross-sell commissions and the fact that the regular commissions paid were being based on the product price in effect on September 1, 1973, rather than the higher current market price for all sales made after January 1, 1975. Defendant responded by filing its motion to dismiss, alleging that the court lacked jurisdiction of the subject matter. As we have previously stated, the motion to dismiss was denied, and the denial was subsequently affirmed on appeal to this court.

During the interim following filing of the instant suit, each of the plaintiffs named herein except one has executed the conversion agreement, thereby becoming independent jobbers. The single exception, Ralph Billington, executed a final settlement agreement. Both the conversion agreements and the final settlement agreement contained the following release:

> "9. MUTUAL RELEASE OF CLAIMS, CAUSES AND LIABILITIES
>
> (a) With only those exceptions stated in subparagraph (b) of this Paragraph 9, and in consideration of the execution of this Agreement, AMOCO and BUYER mutually and unconditionally release and discharge each other from any and all claims, causes of action, and liabilities, whether known or unknown, arising from any

agreement, transaction or cause of dealing between the parties or from AMOCO's policies and practices up to and including the date of this Agreement.

(b) Sub-Paragraph (a) of this Paragraph 9 shall not affect: (i) AMOCO's obligations to BUYER under Company Employee Benefit Plans and the Agent's Severance Allowance Plan as accrued to the Closing Date, (ii) BUYER's obligation to account for AMOCO's funds and merchandise handled by BUYER as an agent, or (iii) AMOCO's and BUYER's performance under current agreements and leases between the date of this Agreement and the Closing date."

On August 16, 1978, defendant filed its answer, denying that money was due and owing to plaintiffs for regular or cross-sell commissions. The answer also raised two affirmative defenses, one of which alleged that for good and valuable consideration, each of the plaintiffs named herein signed a release contained in either a conversion agreement or a final settlement agreement after the accrual of the cause of action set forth in the complaint. In their answer to affirmative defenses, plaintiffs alleged that the releases were executed "* * * under economic duress and * * * contrary to the public policy of the State of Illinois." Defendant then moved for summary judgment. The trial court made findings of fact, granted the motion, and entered judgment in favor of defendant and against the 14 plaintiffs.

On appeal, plaintiffs contend that their allegations, when considered in a light most favorable to them, raise a material issue of fact and that, consequently, entry of summary judgment against them was erroneous. In particular, plaintiffs argue that summary judgment is inappropriate where allegations of economic duress are involved because such allegations involve a question of fact, the state of mind of the parties. Plaintiffs further urge that the determination of the existence of economic duress is undoubtedly a question of fact, where the parties to the document in question are in unequal bargaining positions. Finally, plaintiffs contend that the release which they executed inordinately favors the defendant, which more certainly renders their claim of economic duress a material question of fact and thus not subject to summary judgment.

A summary judgment is considered a drastic remedy and is to be awarded and reviewed with due care and caution. (*Bloomer Amusement Co. v. Eskenazi* (1979), 75 Ill. App. 3d 117, 394 N.E.2d 16.) However, summary judgment procedure is to be encouraged because it promotes efficient and economical use of the judicial system. (*Manahan v. Daily News-Tribune* (1977), 50 Ill. App. 3d 9, 365 N.E.2d 1045.) If a genuine issue of material fact exists, a motion for summary judgment may not be

granted. Conversely, if no such issue exists, the court may then consider whether the moving party is entitled to judgment as a matter of law. *Manahan v. Daily News-Tribune*.

In determining whether there is a genuine issue of material fact, the trial court is required to consider the pleadings and admissions, affidavits in support of and in opposition to the motion, and any other evidence before the court. (*Manahan v. Daily News-Tribune*.) Further, the trial court must construe the pleadings and affidavits most strictly against the moving party and most liberally in favor of the opponent in ruling on the motion. (*Bard v. Harvey* (1979), 74 Ill. App. 3d 16, 392 N.E.2d 371.) Since the opposing party has the right to a trial if there is a genuine issue of fact, the right of the moving party to summary judgment must be clear and free from doubt, and the granting of the motion cannot be a matter of judicial discretion. (*Manahan v. Daily News-Tribune*.) While a plaintiff against whom a motion for summary judgment has been filed need not prove his case at this preliminary stage, he is required to present some factual basis that would arguably entitle him to a judgment under the applicable law. (*Martin v. American Legion Post #784* (1978), 66 Ill. App. 3d 116, 383 N.E.2d 672.) If only the complaint and answer purport to raise issues of material fact, and these issues are not supported by the evidentiary facts and affidavits, summary judgment is proper. (*Manahan v. Daily News-Tribune*.) Only material facts are to be considered. Facts unrelated to the essential elements of the plaintiffs' cause of action are immaterial, and regardless of how sharply controverted, their presence in the record will not warrant denial of a motion for summary judgment. *Mid States Vending Service, Inc. v. C.A.P., Inc.* (1977), 45 Ill. App. 3d 947, 360 N.E.2d 448.

In the instant case, plaintiffs argue that the issue of economic duress would operate to bar the application of any release signed by them. They urge that whether such duress existed is an issue of fact to be determined by the trier of fact and not by the court in granting a motion for summary judgment.

■■ We agree that the question of whether the facts alleged by plaintiffs actually occurred is a question of fact. However, the summary judgment procedure utilized in the case at bar is not designed to infringe upon the role of the fact-finder by determining an issue of fact, but rather to ascertain whether such an issue exists based on the record. (*Dowell v. William H. & Nelson Cunliff Co.* (1975), 26 Ill. App. 3d 388, 324 N.E.2d 660.) Whether there is any question to present to the trier of fact is, in the first instance, a question of law to be determined by the court. *Cf. Roberts v. Dahl* (1972), 6 Ill. App. 3d 395, 286 N.E.2d 51.

Economic duress is present where one is induced by a wrongful act of another to make a contract under circumstances which deprive him of the exercise of free will, and a contract executed under duress is voidable.

(*Cf. Kaplan v. Kaplan* (1962), 25 Ill. 2d 181, 182 N.E.2d 706.) To establish duress, one must demonstrate that the threat has left the individual "bereft of the quality of mind essential to the making of a contract." *Kaplan*, 25 Ill. 2d 181, 186, 182 N.E.2d 706, 709.

Acts or threats cannot constitute duress unless they are wrongful. However, the term "wrongful" is not limited to acts that are criminal, tortious, or in violation of contractual duty, but extends to acts that are wrongful in a moral sense as well. (*Kaplan*.) In terms of "economic duress," also known as "business compulsion," the defense of duress cannot be predicated upon a demand which is lawful or upon doing or threatening to do that which a party has a legal right to do. (*Butler v. Metz, Train, Olson & Youngren, Inc.* (1978), 62 Ill. App. 3d 424, 379 N.E.2d 1255.) Furthermore, duress does not exist where consent to an agreement is secured because of hard bargaining positions or the pressure of financial circumstances. Rather, the conduct of the party obtaining the advantage must be shown to be tainted with some degree of fraud or wrongdoing in order to have an agreement invalidated on the basis of duress. (*Higgins v. Brunswick Corp.* (1979), 76 Ill. App. 3d 273, 395 N.E.2d 81.) The distinction was explained in *Chouinard v. Chouinard* (5th Cir. 1978), 568 F.2d 430, 434:

> "A contract is voidable where undue or unjust advantage has been taken of a person's economic necessity or distress to coerce him into making the agreement. However, a duress claim of this nature must be based on the acts or conduct of the opposite party and not merely on the necessities of the purported victim. Thus, the mere fact that a person enters into a contract as a result of the pressure of business circumstances, financial embarrassment, or economic necessity is not sufficient. Unless wrongful or unlawful pressure is applied, there is no business compulsion or economic duress, and such a claim cannot be predicated on a demand which is lawful or on the insistence of a legal right."

■■ In the instant case, while plaintiffs were faced with a difficult decision which would certainly alter their contractual relationship with the defendant, there was no evidence of the element of "wrongfulness" on the part of defendant. The union contract and its extension had expired on August 31, 1974, without the exercise of unfair labor practices on the part of defendant; therefore, the terms of the union contract were not a factor. The individual employment contracts between plaintiffs and defendant were terminable at will by either party by the giving of 30 days notice. Hence, either party was free to terminate the individual employment contract for any reason. Furthermore, plaintiffs may not rely on the disparity in the size of the parties entering into the agreement to establish economic duress. The mere presence of economic power, without some wrongful use of that power, does not in and of itself constitute economic

duress. (See *LaBeach v. Beatrice Foods Co.* (S.D.N.Y. 1978), 461 F. Supp. 152 (applying Illinois law); *Undersea Engineering & Construction Co. v. International Telephone & Telegraph Corp.* (9th Cir. 1970), 429 F.2d 543.) Without a further showing of wrongfulness on the part of defendant, plaintiffs cannot support a basis for judgment on the grounds of economic duress.

■■ Beyond the necessity of showing a wrongful act on the part of defendant, plaintiffs must establish that economic duress left them "bereft of the quality of mind essential to the making of a contract." Again, plaintiffs have failed to indicate some factual basis that would arguably entitle them to judgment. According to uncontroverted testimony in the depositions of the plaintiffs, each plaintiff was given all of the facts relating to the jobber conversion program, including information regarding the release of prior claims, nine months to a year prior to execution of the agreements. When a party has ample time for inquiry, examination, and reflection, it is less likely that his will was overborne by economic duress. (*Hyde v. Lewis* (1975), 25 Ill. App. 3d 495, 323 N.E.2d 533.) There is no evidence of threats or unpleasant hints or suggestions, which characteristically accompany contracts executed under duress. (*Butler v. Metz, Train, Olson & Youngren, Inc.*) Furthermore, uncontroverted evidence indicated that plaintiffs were aware of the claims they waived in signing the release, and each plaintiff had access to and consulted with an attorney prior to signing the agreement. These factors are also significant in rebutting a claim of economic coercion. (*Staren & Co. v. Shapiro* (1972), 3 Ill. App. 3d 417, 279 N.E.2d 470.) Finally, it was shown that each plaintiff who signed the conversion agreement, thereby becoming an independent jobber, retained the benefits of other provisions of the agreement, apart from the release, since the execution of the agreement. This, too, is a factor in rebutting any claim that the plaintiffs were "bereft of the quality of mind essential to the making of a contract." *Joyce v. Year Investments, Inc.* (1964), 45 Ill. App. 2d 310, 196 N.E.2d 24.

■■ In order to sustain a claim of economic coercion or duress, plaintiffs must establish (1) a wrongful act and (2) the absence of the quality of mind essential to the making of a contract. The instant plaintiffs have failed to establish a prima facie showing of either factor. The absence of either would have authorized the court's granting of summary judgment. Accordingly, the order of the trial court granting summary judgment is hereby affirmed.

Affirmed.

KARNS and HARRISON, JJ., concur.